HOUSTON BELT & TERMINAL RAILWAY COMPANY V. JOE K. STEPHENS.

No. 2530.   Decided May 8, 1918.

1.—Master and Servant—Line of Duty—Car Checker Riding Train in.
    Yards.

A servant employed in checking cars in yards, having checked a train
there, mounted on the side steps of a caboose of a passing train to ride to
the depot several blocks away where it was his duty to return his check book,
and in this position was injured by striking a switchstand negligently placed
too near the track for the safety of one so doing. He had neither been
instructed nor forbidden to ride passing trains in going to and fro between
the depot and yards in performing his service, but being able thus to do his
work more rapidly, had, with the knowledge of and without objection from his
superiors, practiced doing so.  Held, that the question whether, in thus board-
ing the caboose, he was acting in the line of his employment and entitled to
care for his protection, was, under the facts, one for the jury to determine.
(Pp. 201-203.)

2.—Same—Cases Distinguished.

St. Louis Southwestern Ry. Co. v. Spivey, 97 Texas, 144, distinguished.
Chicago, R. I. & T. Ry. Co. v. Oldridge, 33 Texas Civ. App., 439, and Missouri,
K. & T. Ry. Co. v. Rentz, 162 S. W., 960, followed.   (P. 202.)

3.—Same—Charge.

An instruction that plaintiff, an employe injured while riding on the side
of a caboose from the yards where he had been checking cars to the freight
depot, which, in order to recover, required the jury to find that in assuming
such position "he was performing his duty in the manner expected of him by
the defendant under the circumstances" was not erroneous as authorizing a
finding in his favor when he was occupying such position as a mere licensee.
(Pp. 199-201, 203.)

4.—Evidence—Opinion.

Admitting evidence as to what a witness would have done under certain
circumstances did not constitute reversible error where, the uncontradicted
evidence showing that such circumstances did not exist, the answer could not
have affected the verdict.   (P. 203.)

5.—Same.

A yardmaster is held qualified to testify as an expert that the yard tracks
could have been so constructed as not to place a switchstand so near them as
to threaten injury to an employe riding on the side of a moving car.   (Pp.
200, 203.)

Questions certified from the Court of Civil Appeals for the Eighth
District, in an appeal from Harris County.

The majority and the dissenting opinion in the appellate court may
be found in 155 S. W., 703, wherein the judgment was reversed, opinion

by Harper, C. J., Higgins, J., dissenting, whereupon the case was certified to the Supreme Court on dissent.

*Andrews, Ball & Streetman* and *John M. King,* for appellant.—Under the law and the undisputed evidence in this case appellee was a trespasser or, at best, a mere licensee, in attempting to get upon, getting upon, and riding upon said moving train or caboose, and the undisputed evidence fails to show that appellant had failed to perform any duty which it owed appellee as a trespasser or licensee. St. Louis S. W. Ry. Co. v. Spivey, 97 Texas, 143; Lynch v. Texas & P. Ry. Co., 133 S. W., 522; Lovett v. Gulf, C. & S. F. Ry. Co., 97 Texas, 436, 79 S. W., 514; Hopkins v. Garrison-Norton Lbr. Co., 144 S. W., 310; Freeman v. San Antonio Brewing Co., 38 Texas Civ. App., 396, 85 S. W., 1165; Mitchell-Tranter Co. v. Ehmett, 23 Ky. Law Rep., 1788, 65 S. W., 835; Bowling Green Stone Co. v. Capshaw, 23 Ky. Law Rep., 945, 64 S. W., 507; Shadoan's Admr. v. Railway Co., 26 Ky. Law Rep., 838, 82 S. W., 567; Southern Ry. Co. v. Bentley, 56 So., 249 (Ala.).

The court in its charge permits appellee to recover, even though the evidence shows that he was a mere licensee in so riding upon said cars, engines and trains in returning to said office. Atchison, T. & S. F. Ry. Co. v. Hamlin, 67 Kan., 476, 73 Pac., 58.

The court erred in permitting Stephens to testify that if the railroad company, or any of its representatives, had told him not to ride on the cars, he would not have ridden on said cars, in this: As to what he would have done would have been a mere conjecture and opinion of the witness. Freeman v. Taylor, 125 S. W., 613; Lewis v. John Crane & Son, 62 Atl., 60, 78 Vt., 216; Reeder v. Huffman, 41 So., 177, 148 Ala., 472; Met. L. Ins. Co. v. Hall, 52 N. E., 345, 104 Va., 572; Yerkes v. Railway Co., 88 N. W., 33, 112 Wis., 184, 88 Am. St. Rep., 961; Rutledge v. Railway Co., 19 S. W., 38, 110 Mo., 312.

Whether or not the switch in question was negligently located too close to the track was an issue for the jury, and it was not permissible for the witness to testify that it would have been safer further away from the track. Galveston, H. & S. A. Ry. Co. v. English, 59 S. W., 626; Shelly v. City of Austin, 74 Texas, 608; Holmes v. Bluff City Lbr. Co., 133 S. W., 819 (Ark.); Central of Ga. Ry. Co. v. Goodwin, 120 Ga., 83, 47 S. W., 541.

*John Lovejoy* and *J. W. Parker,* for appellee.—The evidence warranted the jury in finding that it was expected of plaintiff, in the performance of his duties, to ride upon trains under the circumstances he was doing when injured. Texas & P. Ry. Co. v. Brick, 83 Texas, 602, 603; Cleveland Rolling Mill v. Corrigan, 46 Ohio St., 283, 20 N. E., 466; Thall v. Carnie, 52 Hun, 614, 5 N. Y. Supp., 244.

If appellant expected plaintiff to ride the cars under such circumstances, it gave him a right to ride them, and of course the charge was not erroneous. St. Louis S. W. Ry. Co. v. Spivey, 97 Texas, 146.

Defendant did not question in its motion for new trial the sufficiency of the evidence to show the switchstand was too close to the track, and nowhere in its brief questions that fact; in other words, that it was too close was not a controverted issue, and this being so it certainly could do no harm for the witness to state, or anybody else for that matter, that "it would have been safer further away from the track." But the witness was defendant's general yardmaster, in control of the yard and supposed to know the proper distance for switchstands to be from the tracks, and it was competent for him to make the statement as an expert. This witness said the switchstand which struck plaintiff was one of three out of fifteen or more in the yard that was that close to the track, and he explained that it was as close as it was because of the closeness of the tracks. Of course, with the fact conceded that the switchstand was too close, no harm could be done in saying that it would have been safer further away. Certainly the statement of a proposition so self-evident can not be ground for reversal.

MR. JUSTICE GREENWOOD delivered the opinion of the court.

Questions certified from the Court of Civil Appeals of the Eighth Supreme Judicial District of Texas, in an appeal from the District Court of Harris County.

This case is before us on the following certificate of the Court of Civil Appeals, towit:

"This was a suit by Joe K. Stephens to recover damages for personal injuries alleged to have been inflicted upon him while in the service of the Houston Belt & Terminal Railway Company, and upon trial before a jury verdict and judgment in his favor was rendered for $15,000.

Appellee, upon the date of his injury, was a minor, eighteen years of age, and was employed by appellant as one of its car checkers in its yards situated in and near Houston, Texas, and it was his duty to enter the numbers, initials and seal numbers of cars received by appellant in said yards in a book provided for that purpose; this book was kept in the office of the chief clerk in the freight depot at the end of appellant's yards, and whenever appellee had finished checking a train of cars it was his duty to return the book to the chief clerk's office. Appellee had been employed for one month as a call boy by the International & Great Northern Railway Company prior to his employment by appellant, and had been in the service of appellant for one month prior to the date of his injury. On the occasion of his injury appellee and a co-car checker, Clifford Joplin, had just finished checking a train of cars and the day's work was ended, but it was appellee's duty to return the seal record back to the office of the chief clerk. Just at this time a train passed and appellee and Joplin undertook to board the caboose of same for the purpose of riding to the depot, which the train would pass, where it was appellee's duty to go to deposit his record book. Joplin succeeded in boarding the train, and appellee was attempting to do so but before being able to lift himself into the caboose the movement of

the train carried him forward and against an upright switchstand adjacent to the track, and the contact with the switchstand precipitated him to the ground and the wheels of the caboose passed over and severed one leg. . The train which he attempted to board and from which he was thrown was a through Trinity & Brazos Valley train, which was departing for the north from appellant's yards without any stop. The switchstand was negligently placed too near the track.

The train was operated by the Trinity & Brazos Valley Railway Company, and the record is silent as to the relation between such company and appellant, except that it appears the train was in and departing from appellant's yards and was upon its tracks and would be upon appellant's tracks until it passed the depot for which appellee was bound.

The evidence pertinent to a consideration of the questions certified is as follows:

Appellee Stephens in his own behalf testified:

"I worked for the Houston Belt & Terminal Company; I began to work for that company on September 29, 1908, in the yards, at Houston, in the capacity of car checker. Chief Clerk Hope employed me. I went down there and asked him for a job and he said, 'Yes, there is a place open for a car checker,' and he asked me did I know how to do that, and I told him I had never done that kind of work, and he said I would do all right, and he put me to work. The only instructions he gave me was about what I would have to do each day, just the kind of work I would have to do checking cars, and things like that. I worked there one month, up to the time of my injury. During that month I was checking cars. Every train that would come in; while there I was checking cars. How I would do that work, that is, what I mean by checking cars, I had a book called a seal record and when a train came in I would have to go out and take the seals off the side doors, see what they were, some were numbers and some were just letters; then the little end doors, I would have to take them, too, and write them in the seal record, put them down in the seal record; I would do that work whenever a train would come into the yard. The yard was about two miles long, I guess; I don't know where the limits are, but the main tracks across are about two miles; there were two yards. Well, there is one they call the 'New Yard,' then an old yard and the 49 was the South Yard; I guess there would be three yards if you count those separately. Those yards were named by 49 and the Old Yard. The old yard was right along where the Santa Fe freight depot used to be, the first tracks before they built this new part down there; that was inside the corporate limits of Houston. The 49 yard was about three miles or three and one-half miles below the Old Yard. The dimensions of the Old Yard, the one in the city, the length of the yard, it was a mile and a half across, or two miles, and the width is—it has about seven or eight tracks, I suppose. In the Old Yard in the city here, I think there is seven or eight tracks, may be ten, I am not certain how many; there was four in the 49 yard then, I believe, I am not sure.

My duties required me to check cars in both of these yards.   The trains that I would check in the Old Yard would generally be on the side track, on either side of the main line; they were on different tracks, they would pull in on any, most, that was open.   I didn't have a particular place where I checked every train.   The way I would find out when I had to check a train, the chief clerk would tell me.   I would have to check about fifteen or eighteen or twenty trains a day, may be fifteen or eighteen.   Assuming that a train has come into the Old Yard, the one in the city, and that I have been directed by the chief clerk to take the seal numbers, to check it, the way I would proceed:   The chief clerk would tell me, whenever a train would come in, that I would have to go out and check it, and I had a book there that we called a seal record, and I would go out where this train was, it would be on one of the side tracks, and I would start at one end and take the side seals and put them down in the book, then, I would go in between and get the end seals, and after finishing that side, I would walk on the other side and take them the same way as the other side, then take the seal record back to the office.   The seal record was kept in the chief clerk's office.   It would be on his desk when he would tell me to check a train, or in one of the pigeonholes.   I would then get the record and go out into the yard.   After I finished checking I would take it back to the chief clerk's office.   The seal record would be in my possession only the times when I was checking trains.   The office in which the seal record was kept was in the old freight depot, right on Preston by the passenger depot.   The trains that I would have to check would be located, they would be on different tracks, in different parts.   This depot where the seal record was kept with reference to these seven or eight or ten tracks that I have mentioned as being in the yard, the Old Yard, is at the north end of the tracks.   With reference to the depot, some of the tracks was a good piece away, then others would run right up to it.   The closest track to the depot was the main line.   I don't know the numbers (meaning the tracks), I didn't know they were numbered.   The yard was crooked, there is a curve in the yard; most of them are straight on the other side, some straight ones on the other side.   The furtherest one of these tracks is about a half a mile, I suppose, from this depot, at the south end, but crosswise, it was about a block or something like that, and they ran from the main line across to this track furtherest away, and that distance was about a block.   Sometimes I would have to go to the south end of the Old Yard in getting to a train that I had to check in this Old Yard, and that would be, I suppose, about three-quarters of a mile, or a mile.   I would be called upon to check cars between that distance all the way back to the station, and I did that daily.   In checking cars in Yard 49, one way I would check them there, every morning in the Old Yard, I would have to check every morning, I would have to check that every morning, take the numbers and initials of all cars in the yard every morning, that had to be done every morning; that was in addition to the work of checking

the trains; then, at the South Yard, all I would do down there was, I would check the whole yard. To get from the Old Yard to the South Yard, or Yard 49, I would have to ride, with a switch engine going down, or other trains that stopped there, and I would get back the same way, I would have to ride. I did not have any particular train or particular engine that I would ride in going to and from this yard, I would take any that came to hand. In doing my work in the Old Yard, the one in the city here, the way I would get about in the yard, I would, if I was checking a train going out or in, I would know where the train was before I left, he (meaning the yard master) would tell me where it was, then I would walk out and check it as much as I could. It had occurred that before I finished checking the train that the cars in it would be moved, that happened every once in a while; in that case, about the work, I would have to get on them wherever they took the cars. I would get on the side or the top, I generally got on right where I checked, right where I would be checking; I would hang on the side, on the handle bars at the side and the end of the car, that ran by the side of the car; and if the car was moved, I would catch onto it and ride it until it came to a stop; then I would start checking again, I would go on with my checking; I done that often, I had to do that because they moved them (meaning the train) often. When I would be going to check a train that was some distance away, and the engine or car, or train, happened to be moving in that direction, my practice was, I would ride if there was one coming that way. Now, after I would get through with my work, and the engine, or engine and car, or train, was passing in the direction of the depot, where I would have to leave my seal record, I would ride if there was one that was going that way; I done that every time, may be two times a day; any time they came by I would do that, I did that often both in going to my work and returning. The yard master's name was Mayfield, Charley Mayfield, I believe. I saw him in the yard, he was in the yard all the time. The yard master had charge of the yard there, this man Mayfield. He was where he could see me, he was up and down in the yard all the time. My duties required me to work there in the yard, and his (the yard master's) duties required him to work there in the yard, he was working right at the same place I was. He was where I could see him during the day. I was right there working where he would be passing at all times of the day, and I could see him; he would be passing right by me, I was close enough to speak to him; I was close enough to him to touch him; that was often, that was a daily occurrence to be close to him; we were both working there in the same place. Not when I saw him would there be any obstructions between me and him, he would be right along by me. I have talked with him. He didn't have so much to do about telling me about performing my duties, only going to 49 and doing my work; of course if I didn't do my work he would have to tell me. They have told me to ride cars in the yard there, the yard master did that, I mean Mr. Mayfield. These trains that would come

into the yard that I would have to check, there would be the engineer and fireman and the conductor and may be two brakemen composing the crew; I would see these men. I saw them getting on and off cars moving through the yard there all the time. I think there was four switch engines employed there in the yard then. The engineer and fireman and the foreman of the engine and three helpers composed the switch crew, and each engine had that number of men in its crew; those men were under my observation all the time. I have seen them get on and off cars moving in the yard there, moving on the same tracks that I mentioned, and moving on these tracks on which I checked the trains; it was a frequent occurrence to see these men getting on and off moving cars in the yard there, it happened all the time. With reference to riding or not riding cars, they never told me not to ride them, the yard master just told me to ride, and the chief clerk told me to do work where I would have to ride, and where I did ride, and neither of them never told me not to ride cars. In riding cars my idea was it was my duty, I would have to do it, or I couldn't do the work. My work was done in the day. I worked days; I would go on duty at seven in the morning, and was supposed to go off duty at six. I had never worked as a car checker for any other company. The work I did there in the yard was the first work I ever did as a car checker. Nobody, I guess, had ever told me what were the duties of a car checker other than as I have stated—they had not told me; nobody had undertaken to tell me what were the duties of a car checker other than as I have told here. Only the time I got hurt did any accident befall me while I was working there as car checker, that very day, that very time. That was October 29, 1908; I had been working there then just one month. To tell the jury in my own language how that accident happened,—well, on the 29th of October, 1908, the chief clerk, Parsons, sent me out to check a train that had just come in from the south, I think it was a B. & M. train, I think there was about thirty cars in this train, and it was on the side track just below the freight depot, the Old Yard, which is on that side of the main line, and I went out there; it was about 7, I guess, or 7:30 at night, getting—just getting dark, and I didn't have any lantern, they didn't furnish me any. On the way down I found Clifford Joplin, who was a car checker in the yard, and he said he would go with me; he had a lantern, and we started, we went down on the other side, the east side, I guess, of this train, and he was going up and getting the seals with the lantern and seeing what they were, he would go in between the cars and get the end seals, then the side seals, and he would bring the lantern back and I would put them down in the book; that went up on the east side, and we were turning to come down on the other side and was getting the seals on that side, and we were just finishing up when a train come up pulling very slow, it was about 8 o'clock, I suppose, and we were supposed to get off at 6, and we got on this train to go back to the depot, he had just got on and I had got on and rode about ten or twelve feet when

I got hit in the side by a switchstand and it knocked me off, my right foot went under the truck of the caboose, and this boy, when he saw what happened, he got off (meaning Clifford Joplin), and he seen that I was hurt, and he flagged a switch engine that was coming right in behind that train, and they put me in the cab of the engine and took me to the St. Joseph's Infirmary, and they amputated my leg, my foot; they cut it off about two inches above the ankle. The train that I got on was going north. I undertook to get on the other side, the east side, I guess it is. On the other side of the depot would be on the east side. It was a caboose that I undertook to mount; I didn't know at that time what kind of a caboose it was, it had a side step on it; that ran in, right along the side door; there was one door on each side of the caboose; the caboose had side doors, one of those kind that had side doors. Underneath the door there was a board, I guess about twelve inches wide, I don't know about that, and about seven or eight feet long; this board was there as a step to be used in entering the door of the caboose. I think the caboose door was closed, most of it anyhow; it was the step that I undertook to get on, this board or step; my object in getting on it was to go to the depot to put the seal record and the lantern up to go home. Joplin had got on just before I did, he got on ahead of me. I did not know that that switchstand, recall that that switchstand was there when I undertook to get on, there was no telling whether it was close or not, it was dark, there was no lantern on it, it was not lit if it was. I say I didn't know it was there when I went to get on. It must have been an upright switchstand that struck me, it hit me on the side right along here. (He stands up and indicates.) I had a watch here and it hit the bottom of the watch. I know I was struck by the switchstand; I did not know that it was close enough to the track to strike me. I had never learned at any time while I was at work there in the yard that that switchstand was close enough to strike a man riding on the foot board, or undertaking to get on it when passing. I never heard anybody say; nobody never told me this switchstand was too close, and I didn't know it was too close for anybody to be hit by it. Now, when I undertook to get on this board, and while I was on it, as to whether I did or not consider that I was in the performance of my duty as a car checker, well, I thought it was part of my duty to go from any part of the yard to the office, and from any part of the—I mean the office to other parts of the yard, to ride on the train. I knew where all of the tracks were, and I knew that there is a switch for every side track, and I knew it prior to the accident.

"I say I was eighteen years old when I entered the service of the defendant company. My appearance then as to being a boy or otherwise, I was young looking for my age at that time; I weighed at that time about one hundred and eighteen or one hundred and nineteen; my face was smooth; I suppose I have grown four or five inches since then; I was small for my size at that time. At that time boys were employed in the service of car checking. At the time I was employed there was

one car checker that worked in the same part of the yard I did, and there was a transfer clerk; Clifford Joplin was the name of the one who worked in the yard with me, he was a boy about my age; he was with me on the night of the injury.  In doing his work he would ride the cars under the circumstances I would.  They called that switch the old roundhouse switch.  I was never told by anybody that if I undertook to ride a car under the circumstances I was doing on the night I was injured by that switchstand that I would be in danger of being knocked off by it, nobody ever told me it was too close. . . . When I would go to the South Yard I would go on a switch engine or whatever was going down.  While I was checking cars in the Congress Street yard, if they were moving, why I had to get on, if they were moving, I got on them and went with them; I had to get on them or lose trace of them when the switch engine took the cars away; in other words, if I had not finished checking, if checking a train when I was moved, I would have to go with it to finish checking it; that is the purpose I got on the train for. . . . This train that I was checking was south of the freight depot on the side track east of the main line; about two or three blocks south from the freight depot.  I don't know exactly about how many cars there were in that train, I suppose about thirty. The train was not moving at any time I was checking the cars there, that train.  I stated that on my way down I met Clifford Joplin, and he went down there with me.  I don't know how long it took me to check the cars in that train, about thirty or forty, something like that, minutes, may be an hour, I am not certain.  I had just finished checking the cars in that train when I had started back to the depot; when I finished I was ready to go back to the depot.  I didn't have to check any more that night; my work of checking was finished for the night, that was the last train I would have to check,—my work wasn't finished, I had to take the seal record and put it in the office before I left; they had to stay in the office all the time because they done their work by that, by the seal record, by that book, I mean.  When I finished checking this train, I was two or three blocks then south of the depot.  This train that was passing that I was injured by, at the time I was injured, was a northbound freight train, I don't know what it was; that train was pulling through the yard going north; it was not a string of cars with a switch engine, or anything like that, it was a freight train; and it was not my duty, or I didn't intend at that time, to check any cars in that train, and I hadn't checked any cars in that train.  I had just got on the side of that train; I made an effort to ride back to the freight depot to put this seal record up, and this other boy had to put his lantern up, and we would be off.  The reason I attempted to get on this train instead of walking down to the depot, it is customary for all employes in the yard to ride if they want to go to any part of the yard there; if they go out of the yard, they get on the train and go out.  As to its being a fact that I just decided it would be a little more con-

venient to go back that way, and for that reason I got on that train,—
it was customary; that was my understanding, I say it was customary
for them to ride if going back to the depot, and you can do your work
quicker. As to whether it is a fact that I attempted to get on the train
because it was more convenient for me to do it than to walk,—well, you
can do your work quicker; it is just as easy to do your work that way,
you can do your work quicker. As to whether that is the reason I at-
tempted to get on the train instead of walking back to the depot, I do
anything to do my work quicker; and in daytime even the yard master
sees you, and all the others see you, it is customary to ride on trains.
On this particular occasion I had finished all my work of checking cars,
I had finished checking the train, and I was going back to the depot
to leave my book there, and then I was going home; that was part of
the work, to put the book back, I was not finished until the book was
in the office. After I put up the book, I didn't have any more work
to do that night. I had checked cars in the South Yard. I said that
when I worked at the South Yard to check cars, when I went there, I
would get on the switch engine and ride out. Q. Now, Joe, isn't it a
fact that the only time you were authorized to get on cars and ride was
when you were going out to the South Yard, or coming back, or when
you were checking a train of cars, and they moved the cars before you
finished your checking? A. No, sir; you could ride any time; the yard
master was around there, and if it was not customary, I suppose he
would have said so, he could have said so, I suppose; he has told me
to go out to 49, and he has told me to come back, and if the train was
moving, he has told me to get on there and check it, and I had to check
it, he would tell me to ride; if trains that I was checking started to
move, why I would get on and go with the train to finish my checking.
I was standing a little back of the door on the side upright on the run-
ning board when I was struck. It is a fact that I testified on a former
trial of this case, when I was asked the question: 'At the time you
were hurt you were standing up on that running board?' and I answered
'Yes.' No one told me that I was to ride trains after finishing my work
in the yard for the purpose of putting up my book. I said after I had
got on the running board the caboose had gone something like ten or
twelve feet before I was struck. I was struck at the right side. Clif-
ford Joplin was not hit, he was standing on the running board leaning
in the door, he was not hurt. As to whether it is a fact that I testified
on a former trial of the case that the only time I was authorized to ride
trains was when I was going to or coming from the South Yard, or
when I was checking a train, and they moved that train before I had
finished that checking,—that might be the only time I was authorized
to. The only time I was authorized to ride on trains was when I would
go out to the South Yard, or come back, or when I was checking a train,
checking a cut of cars, and hadn't finished my checking and they moved
them, and I got on them and rode; those are the only times he told me
to ride, he has told me that. The South Yard is about three and one-

half miles south of the Congress Street Yard. As to whether there is any yard between the Congress Street Yard and the South Yard,—well, there are some tracks at the roundhouse; they do a little switching at the roundhouse, not much; that is not just with engines and things like that, they have cars out there, too, there are two or three tracks. The roundhouse from the Congress Street Yard is about a mile, and the South Yard is about two and one-half miles south, to the South Yard, I guess. Between the Congress Street Yard and the roundhouse, and between the roundhouse and the South Yard, as to whether they make up or break up any trains at those points,—well, I don't know about that, they stop there, I know the roundhouse, I—I don't know whether they do or not between the roundhouse and the South Yard. I never checked any cars between the roundhouse and the South Yard, and I never checked any cars between the roundhouse and the Congress Street Yard. . . . This other boy, Clifford Joplin, was not hit by the switch; he was standing or leaning in the door with his feet on the running board; he was not hurt at all. . . . I was employed to work for the Houston Belt & Terminal Railway Company, and I was working in the yard of that company when I was injured, during the month of my service. In answer to a question of Mr. Burns, I said that nobody ever instructed me to ride the cars in the yards in going to and from my work, that nobody ever told me not to do it. . . . If the railroad company or any of its representatives had ever told me not to ride those cars, I would not have done it, I couldn't do the work without riding; I thought it was right to do it."

· Defendant introduced and read in evidence paragraphs 16 and 17 of the application for work signed by plaintiff.

"16 Do you understand that in the discharge of your duties it will be sometimes necessary for you to use tracks, cars, machinery and appliances that are defective, and that it is necessary for you to examine cars, machinery and appliances, that you have to use, carefully, to prevent injury to yourself and others? Yes. · Also do you understand that as far as possible you should acquaint yourself with the condition of the track? Yes. Do you agree to use diligence in ascertaining the condition of cars, machinery and appliances with which you have to come in contact or use in the performance of your duties which would render your work dangerous or subject you to injury? Yes."

"I say that I had been working for the Houston Belt & Terminal Company about a month when the accident happened."

C. E. Mayfield, defendant's yard master at the time appellee was injured, testified:

"The people employed in that yard and about it are under my supervision. I had authority to forbid any practice that I saw proper; and that applied to car checkers as well as other employes, outside of switchmen; of course that was their business. With reference to my answering Colonel Jackson's questions that I didn't tell Joe to ride on passing trains or any cars switching around there going to the office after he

had gotten through checking in order to deliver the books,—I don't believe I did tell him not to do it. . . . I don't suppose I would know Joe Stephens if I would see him. I remember the circumstance of his being injured; I remember a young man by that name in the employ of the company. I never did give instructions to him or anyone else in the Congress Street Yard to get on moving trains and ride from the yard up to the office. Within my knowledge while I was yard master there, or while I was switchman there, it was not the custom and practice for car checkers, after finishing their work, to get on moving trains or cars and riding to the office for the purpose of leaving their book, I don't remember seeing them do it, but I suppose they did do it; I never instructed, permitted or authorized that, my instructions did not authorize or permit it. . . . The South Yard is two miles and a half from the city yard. . . . If the trains happened to be moved at some other place in the yard, as to whether he rode those cars around, and whether it was his duty to do so,—in the Congress Street Yard it was his duty to walk over there and tag them, he had no business on the cars when they were switching them up and down. Say he is now taking the numbers and seals on a string of cars and the switch engine comes along and takes them,—moves them entirely,—moves them to another part of the yard and mixes them up with some other train or goes around to some other train,—if they did that it would be his duty to go to get the seals and tag them, but—it was his duty to follow the cars; it was his duty to—they marked the cars and seals; they didn't ride the cars in doing that; I couldn't say that I never saw them ride the cars, I don't recollect seeing them ride the cars, because the tracks are close together. As to my being told that they did ride the cars after they got through checking back into the office,—I was told the next morning after that young man was hurt; I was not told before that that the boys did it. I was around in the yard every day; I never seen them riding cars back to the office; I see those men riding the cars, I couldn't say whether they were checkers or not. It is not a fact that I have seen those checkers riding cars and following them about for the purpose of doing that work, I didn't see them; I have seen some of them do it, of course I have. I did say I told them to ride the cars down to the lower yard, for the purpose of checking and doing their work. This up-town yard is about five blocks long, five or six blocks, about twelve to fifteen hundred feet."

W. B. Edwards, witness for defendant, testified: "I worked for the Trinity & Brazos Valley Railroad Company, and ran over the Houston Belt & Terminal Railway Company's tracks. I held the position of brakeman with the Trinity & Brazos Valley Railway Company; I was working for that company in the year 1908. I do recall something of an accident to the plaintiff, Joe K. Stephens. I was rear brakeman on the train that the accident happened on. The train at the time of the accident was in the Houston Belt & Terminal Railway Company's yard and heading out north to go to Tomball, in what was known as the

Congress Street yard. That train had come from Galveston; it was a freight train. We stopped out in the lower part of the yard and set out about half of our train, we left with twenty-seven cars. We stopped in the Congress Street yard; that was before the accident happened, and then we started out north. I was standing in the caboose door and watching ahead, and the boy that was with Stephens caught the caboose, that attracted my attention, and I looked around, I looked back, and as I looked back I saw the boy running to catch the caboose and just as he reached to catch it, he fell, he struck the switchstand and fell. I say there was another boy with him, with the one that caught the caboose. This was a box car caboose, a box car converted into a caboose. The boy that caught the caboose was standing on the rear end of the step, on the east side, or right hand side of the train; the train was going north, and he was standing on the right hand side, on the running board. I saw as we were going out we were looking north, and when this boy caught on the caboose that attracted my attention and I looked around; it was not our intention to stop at the depot, we were going straight through. When the plaintiff stumbled there, I did not know at that time whether or not he had injured himself; I first learned that he had after we arrived at Belt Junction. Belt Junction with reference to the Congress Street yards, I would suppose, it is about five miles and it is north, it is north of here; this was between seven and eight at night, as well as I can remember. '. . . I don't remember whether the following question was propounded to me on the former trial, 'Did you think he got hurt in any way?' and that I answered, 'No, sir.' I suppose the following question was asked me on the former trial, 'You did see him fall off?' and I answered, 'I said just about the time he reached up or caught hold, he hit the switchstand,' and I suppose it was true when I answered it this way. To the question asked me on the last trial, 'As well as you remember, why couldn't you remember if he was on the ground or if he was on the footboard?' I did answer, 'Just about the time he reached for the iron he fell, it happened so quick, I don't remember whether he swung onto the step or hit the switchstand and fell first'; that was true; I can't state definitely whether his foot was on the board or not, on account of the fact it was done so quick; the step was not dark, the light from my lantern was on the step. I was not looking for any accident to happen, and I didn't, I said, I didn't know about it until I got up to Belt Junction."

Clifford Joplin, witness for defendant, testified:

"I was employed by the Houston Belt & Terminal Railway Company; I was working for that company in September and October, 1908; I was working for the company at the time of the accident to the plaintiff, Joe K. Stephens; my position at that time was checking cars and doing calling, everything of that kind, though I was a car checker; I think that was the same kind of a position that Joe K. Stephens held. Relative to my duties and what I would have to do as a car checker, in the morning, the first thing in the morning we would have to go out and

check the yard; I believe they had three checkers at the time I was there, one for the old roundhouse, and one for the new yard, and one for the old yard; we would go out in the morning and check the yards, then come back there, and there would probably be a train or something, and they would send you out to get the numbers and seals of that. They never instructed me about riding on trains with the exception of going out to South Yard, then you would probably go on a switch engine and ride out, then get off; if I was going out to the South Yard, they never told me to get on; I never had any instructions as to returning to the depot after I had finished the train in the Congress Street Yard, as to riding trains; I was never given permission by those who employed me to ride trains after I had finished checking a train in the Congress Street yard on my way back to the depot. Supposing I was checking a train in the Congress Street yard, and before I finished taking the numbers of the cars there and they moved the train, as to what instructions I had as to riding that train,—if we could get them without getting on the train, why get them, best to get them; we were supposed to get them without getting on if we could; I don't know exactly about getting on, but you would have to get them. I don't know whether it was a month or two months that I had known Joe Stephens prior to the time of this accident, I don't remember the exact time. Joe and I had occasion at times to work together in checking cars; I think he is a little younger than I am; I will be twenty-two in April. My relations with Joe were friendly while I was working there; they are friendly now, on my part. I remember about the time Joe got hurt down there. At the time of his injuries, I had got through checking; I had checked a Santa Fe train, the 'Bobbie,' I believe they call it, . . . I came over to Joe, Joe was on a B. V. that had been set out, and I had finished mine and I came over to him and helped him; I had a light; Joe didn't have a light. We finished somewhere between, I don't remember, but seven and eight at night. While me and Joe were working there together and in checking that train and taking the numbers off of it, the one that had the book would put them down in the book; Joe had the book on that trip; I would call the numbers off to Joe and he would put them down in the book. We had finished checking the cars in that train, I had hollered the number on the last car; then me and Joe started to the depot. The depot was about two and one-half or three blocks from the place where we were when we finished checking the train. We did not walk down to the depot. There was a train coming and we hopped it, I got on it, and Joe tried to get on, he grabbed at it, and he hit the switch, and I got—and I heard him halloa, and he says, he broke his leg, and I hopped off and went back to him, and picked him up, I didn't know how bad he was hurt, he had on black stockings, and I picked him up, he wasn't bleeding, and there was a switch engine coming back there, and I flagged it, and we brought him to the depot, and then afterwards taken him to the infirmary in a hack. The train was going north, towards the depot, it was moving between seven and

eight miles an hour; I say it was a T. & B. V. freight train. I couldn't say for sure whether it was a through train or not, it went right on through. I spoke of some B. V. train Joe was checking, that was the one that came in and that was set out. That train was a different train from this T. & B. V. train that was going out that me and Joe tried to get on."

The court charged the jury as follows: "Now, therefore, if you believe from a preponderance of the evidence that Joe K. Stephens, the plaintiff, was in the employ of the defendant as a car checker and that it was his duty to enter in a book provided by defendant for that purpose the numbers and initials and the seal numbers of the cars received by defendant in its yards in and near the City of Houston, Texas, and believe defendant expected plaintiff and its other car checkers to ride cars which might be passing when going to or returning from their work in the yard, then it was the duty of the defendant to use ordinary care to furnish plaintiff and its other car checkers a yard that was reasonably safe for performing the work in the manner expected of them; and if you believe from a preponderance of the evidence that the plaintiff, in the performance of his duty, took the seal numbers of certain cars in defendant's yards in this city, and that after doing that he got on the steps of a caboose attached to a train that was then passing, to ride thereon to the depot for the purpose of leaving the book in which the seal numbers had been entered, and believe that in so doing he was performing his duty in the manner expected of him by the defendant under the circumstances, and believe that after he had got on the said step he came in contact with an upright switchstand and was thereby knocked down and his right foot run over by the wheels of the caboose and injured at the time and place and in the manner substantially alleged in his petition; and you further believe from a preponderance of the evidence that the said switchstand was maintained in such proximity to the track on which the said caboose was moving as to be a menace to the safety of defendant's car checkers in the performance of their duty in the manner they were expected to perform it, and you believe that defendant in so maintaining the said switchstand if it did that, should have foreseen that plaintiff, or some other car checker, would, in the performance of his duty, in the manner expected of him, be injured by coming in contact with the said switchstand, while riding upon cars passing the same under circumstances similar to those under which the plaintiff was injured, and was guilty of negligence, and believe that such negligence was the proximate cause of the injury of plaintiff, and you do not believe plaintiff himself was guilty of contributory negligence, or assumed the risk of injury, you will return a verdict for the plaintiff, and assess his damages according to the rule hereinafter given you, but unless you so find you will return a verdict for the defendant.

"Or, on the other hand, if you do not believe from a preponderance of the evidence that the plaintiff was injured at the time and place and in the manner substantially as alleged by him in his petition, you will,

without inquiring further, return a verdict for defendant; or if you do not believe that plaintiff undertook to get on the caboose and was injured after he had gotten on the step thereof by coming in contact with the switchstand; or if you believe he was thus injured, but yet do not believe that the plaintiff was expected in the performance of his duties to ride on the car under the circumstances; or if you believe the plaintiff attempted to get on the caboose step and in doing so ran against the switchstand and was thereby caused to fall and be injured; or if you believe plaintiff's injury was due to dangers and risks and conditions which were ordinarily incident to his service; or if you do not believe the injury of plaintiff or some other car checker under like circumstances, in view of the way plaintiff was expected to perform the services, was one which should have been foreseen as likely to occur under the circumstances, you will, in either, any or all of such cases, likewise return a verdict for defendant."

On the trial exception was taken to the admission of certain testimony of appellee. The material portion of the bill is as follows:

"Q. If the railroad company, or any of its representatives, had directed you not to ride those cars, would you have ridden them, or not have ridden them?

"Defendant: I object to that as calling for a conclusion of the witness as to what he would have done, and as being irrelevant and immaterial.

"Court: I overrule the objection.

"Defendant: We except.

"A. If they had ever told me not to, I would not have done it. I couldn't do the work without riding."

Exception was also taken to admission of certain testimony of appellant's witness Mayfield. The material portion of the bill is as follows:

"Q. You state, in answer to Mr. Jackson's question, that this switch was as close as it was to the track because the tracks were closer?

"A. Yes, sir.

"Q. Couldn't you have built your tracks further over?

"A. They didn't do it.

"Q. Couldn't you have done it?

"A. It ain't impossible to do anything.

"Q. Just answer the question you could have done it?

"A. Could have done it, yes, sir.

"Q. The reason the switchstand was as close as it was is because you built the tracks so close together?

"A. Yes, sir.

"Q. It would have been safer to have had them further apart, would it not?

"A. It certainly would.

"Mr. Burns: We object to the question, 'It would have been safer to have had them further apart, would it not?' A. 'It certainly would,' on the ground that it is certainly calling for a conclusion of the witness.

"Mr. Parker: I offer it on the ground—this is the yard master, and we have taken his testimony, and he is thoroughly qualified to speak on that point.  He was in charge of the yard, and familiar with its construction.

"Court: I overrule the objection.

"Mr. Burns: Note our exception."

Under the facts stated and evidence quoted above, the majority of this court are of the opinion, under authority of Railway Co. v. Spivey, 97 Texas, 143, that appellee, in attempting to board and ride upon the train from which he was precipitated, was a trespasser, or, at best, a mere licensee, and as such he accepted the train and track over which it was passing in the condition in which he found them, and that appellant was under no obligation to arrange its yards, tracks and switch-stands to secure his safety while so riding or attempting to ride upon said train, and was not liable for the injury caused by the negligent proximity of the switchstand to the track over which said train was passing.

### Question No. One:

Is this view of the majority correct?

It is objected by appellant that the paragraphs of the court's charge quoted above submit an erroneous basis of recovery and authorize a recovery by appellee upon a state of facts which would have constituted him a mere licensee in riding the train from which he was thrown. The majority are of the opinion that this objection is well taken.

### Question No. Two:

Is this view of the majority correct?

### Question No. Three:

Was the testimony of Stephens and Mayfield quoted in the foregoing bills of exception subject to the objection urged against its admission?

### Question No. Four:

If such testimony was objectionable, does its admission constitute reversible error?

The diverse views of the majority and minority of this court upon the questions certified are set forth at length in their respective opinions accompanying this certificate, and the court is respectfully referred thereto for a more complete statement of the conflict existing between the members of this court upon such questions."

We answer the first question in the negative.

The issue as to whether appellee was acting in the line of his duty, when he received his injury, was for the jury, under the facts certified.

Viewing the facts in the most favorable light to appellee, the jury

had a right to find, first: that no specific directions were given to appellee about riding trains, in going from the depot to his work on the yards and in returning from the yards to the depot, save that he had been told to ride in going to, and in coming from, the south yards, and that he had been told to ride trains which were moved while he was checking them; and, second, that in order to increase the volume of work to be accomplished for appellant, in a given time and for a given wage, appellee and his fellow car checkers had habitually ridden on the trains in all the yards of appellant, in going to their work, and in returning to the depot from their work, and that appellant, with full knowledge, approved this method of carrying on its car checking business.

Such findings must negative the holding, as matter of law, that appellee was acting without the scope of his duties when injured. For, as was said by the Supreme Court of Pennsylvania, in Rummell v. Dillworth, 111 Pa., 343, 2 Atl., 358: "The scope of his duties is to be defined by what he was employed to perform, and by what, with the knowledge and approval of his employer, he actually did perform, rather than by the mere verbal designation of his position."

The rule, which finds application to facts certified, was expressed in the case of Bowles v. Ind. Railway Co., 27 Ind. App., 674, 87 Am. St., 279, 62 N. E., 95, in the following language: "In view of the migratory character of the service, such transportation facilitated the prosecution of the work, and was beneficial to both employer and employes. It was, by the conduct of the parties, if not by their express agreement, an ingredient and instrumentality of the employment. . . . The defendant was not carrying the plaintiff gratuitously for the mere accommodation of the latter, without regard to the relation between them created in their contract, but was doing so because of that relation, and as an incident of the employment."

St. Louis S. W. Ry. Co. v. Spivey, 97 Texas, 144 to 147, 76 S. W., 748, determined that the allegations of the petition in that case showed no cause of action against the railway company, since it was not alleged that by the duties of the plaintiff as call boy he "was required or expected to ride upon freight trains which might be passing through the yards," and since the facts which were alleged did not "indicate that his duties required him to ride upon such trains." Here it is alleged and there is evidence to establish that appellee was both required and expected to ride the trains moving in appellant's yards, in the performance of his duties as car checker.

In Chicago, R. I. & T. Ry. Co. v. Oldridge, 33 Texas Civ. App., 439, 76 S. W., 582, 583, approved in Missouri, K. & T. Ry. Co. of Texas v. Rentz, 162 S. W., 960, much prominence was given in appellant's brief to the contention that appellee was not in the discharge of his duty as a freight brakeman when he entered the caboose in the switch yards before his train had been made up, and that hence appellee was a mere licensee or trespasser. In rejecting the contention, the Court of Civil Appeals said: "The testimony of appellee tended to show that it was

customary for freight brakemen, when called to go out with a train, to meet the conductor in the caboose, with the food and clothing required for the journey, while the caboose was yet in the yards, and before the train had been made up. If it be true that appellant's business, as well as that of other railway companies, had been habitually conducted in this manner, as the evidence tended to show, in the absence of a definite rule or positive requirement to the contrary, we could not say that appellee was a mere volunteer when he entered the caboose in this instance. His conduct should be interpreted in the light of the usage or custom pertaining to the service in which he was engaged, and the question was one for the jury."

Answering the second question, we can not agree that the court's charge authorized a finding in favor of appellee "upon a state of facts which would have constituted him a mere licensee in riding the train from which he was thrown."

For, before the jury were authorized to find for appellee, the charge, as a whole, expressly required the jury to find, among other matters: First, that plaintiff in getting on the steps of the caboose to ride to the depot, "was performing his duty in the manner expected of him by the defendant under the circumstances," and, second, that the switchstand was maintained in such proximity to the track on which the caboose was moving as to be a menace to the safety of defendant's car checkers in the performance of their duty in the manner they were expected to perform it, and that defendant, in so maintaining the switchstand, should have foreseen that plaintiff, or some other car checker would, "in the performance of his duty, in the manner expected of him, be injured by coming in contact with the said switchstand while riding upon cars passing the same under circumstances similar to those under which the plaintiff was injured."

Besides, the jury were further expressly instructed that if they did not believe "that the plaintiff was expected *in the performance of his duties* to ride on the car, under the circumstances," then to find for defendant.

The obligation of the master to exercise ordinary care to provide reasonably safe premises can be invoked as the basis for liability for a personal injury to a servant only when the injury has been received in the line of the servant's duty. The charge, of which complaint is made, required appellee to be doing not only the work expected of him by his master but to be doing it in the performance of his duty as servant, and we do not think it failed to safeguard every right of appellant.

We answer to questions Nos. three and four, that the admission of the quoted testimony of witnesses Stephens and Mayfield did not constitute reversible error. The testimony of Stephens as to what he would have done under circumstances, shown not to exist by uncontradicted evidence, could not have affected the findings of the jury on the issues submitted, and we concur in the opinion of the Court of Civil Appeals that the opinion of Mayfield was that of a duly qualified expert.